**Victor Rogers BELL, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 06–00–00142–CR.**

Court of Appeals of Texas, Texarkana.

Submitted May 21, 2001.

Decided May 30, 2001.

David W. Barlow, Beaumont, for appellant.

Rodney D. Conerly, Asst. Crim. Dist. Atty., Philip Babin, Asst. Dist. Atty., Beaumont, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Chief Justice CORNELIUS.

Victor Bell was convicted by a jury of possession of cocaine in an amount greater than or equal to four grams, but less than 200 grams. The punishment range for the offense was enhanced under the habitual offender statute by a finding that Bell had two prior felony convictions and that the second prior felony conviction was for an offense that occurred after the first prior felony conviction became final. *See* TEX. PEN.CODE ANN. § 12.42(d) (Vernon Supp. 2001). The jury assessed his punishment at thirty-two years and six months in prison.

Bell first contends the trial court erred in overruling his motion for new trial, in which he alleged that the jury was charged incorrectly. The charge about which Bell complains occurred during the punishment phase of his trial. The jury was given the charge outlined in TEX.CODE CRIM. PROC. ANN. art. 37.07, § 4(a) (Vernon Supp.2001), which is required when (1) the offense is listed in TEX.CODE CRIM. PROC. ANN. art. 42.12, § 3g(a)(1) (Vernon Supp. 2001), or (2) the judgment contains an

affirmative deadly weapon finding under Tex.Code Crim. Proc. Ann. art. 42.12, § 3g(a)(2) (Vernon Supp.2001). Bell's offense (possession of cocaine) is not listed in Article 42.12, § 3g(a)(1), and the judgment does not contain an affirmative deadly weapon finding. Therefore, the trial court's instruction was erroneous.

The jury should have been given the instruction outlined in Tex.Code Crim. Proc. Ann. art. 37.07, § 4(b) (Vernon Supp. 2001). Such an instruction is required when (1) the offense is not listed in Article 42.12, § 3g(a)(1), or the judgment does not contain a deadly weapon finding, *and* (2) the offense is a first degree felony, (3) a prior conviction has been alleged for enhancement under Tex. Pen.Code Ann. § 12.42(b), (c), or (d) (Vernon Supp.2001), or (4) the offense is a felony not designated as a capital felony or a felony of the first, second, or third degree and the maximum term of imprisonment that may be imposed is longer than sixty years. As mentioned previously, the State alleged two prior felony convictions for enhancement under Section 12.42(d) of the Penal Code.

The instructions in Article 37.07, § 4(a) and 4(b) are similar; the only difference is in the third paragraph. The instruction in Article 37.07, § 4(a) is:

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals *one-half of the sentence imposed or 30 years,* whichever is less, without consideration of any good conduct time he may earn. If the defendant is sentenced to a term of less than four years, he must serve at least two years before he is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.[1]

Tex.Code Crim. Proc. Ann. art. 37.07, § 4(a) (emphasis added). The instruction in Article 37.07, § 4(b) is:

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served plus any good conduct time earned equals *one-fourth of the sentence imposed or 15 years,* whichever is less. Eligibility for parole does not guarantee that parole will be granted.

Tex.Code Crim. Proc. Ann. art. 37.07, § 4(b) (emphasis added).

■ Having determined that the trial court's instruction was error, we must now turn to the question of harm. Because Bell did not object to the erroneous jury charge, the error is reversible only if he shows that the error caused him egregious harm. *Abdnor v. State,* 871 S.W.2d 726, 732 (Tex.Crim.App.1994). In determining whether egregious harm occurred, we must review the error "in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial court as a whole." *Skinner v. State,* 956 S.W.2d 532, 544 (Tex.Crim.App.1997) (quoting *Almanza v. State,* 686 S.W.2d

---

**1.** The jury was actually instructed, "If the defendant is sentenced to a term of less than *six* years, he must serve at least two years before he is eligible for parole." (Emphasis added.) Neither party offers an explanation for the variance from the statutory language, and Bell does not complain about it independently of his complaint about the charge. In any event, we have held that the charge as given was erroneous. Further, this portion of the charge could not have·affected the jury's verdict because the jury was instructed that it must assess a minimum punishment of twenty-five years under the habitual offender statute.

157, 171 (Tex.Crim.App.1984) (op. on reh'g)). Errors resulting in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex.Crim.App.1996) (citing *Almanza v. State*, 686 S.W.2d at 171).

Bell cites *Ovalle v. State*, 13 S.W.3d 774, 787 (Tex.Crim.App.2000), in contending that the Texas Court of Criminal Appeals has lessened the burden of showing egregious harm to a showing of prejudice. *Ovalle* involved an allegation of error in the jury charge to which the defendant objected at trial. *Id.* at 785. Thus, the issue of egregious harm was not before the court in *Ovalle*.

Bell points to the unusual punishment assessed, thirty-two years and six months, and speculates that his sentence resulted from the error. He does not explain his reasoning, and we can discern no reasonable basis on which to draw a similar conclusion.

The jury was instructed that it was not to consider how the parole law might be applied. The jury was also instructed that it was not to discuss how long Bell would be required to serve the sentence it imposed. Assuming, as we must, that the jury followed these instructions, no harm would result.

Even if the jury did not follow these instructions, there was no harm that affects the very basis of the case or deprives Bell of a valuable right. Bell's sentence does not reflect that the parole instruction materially affected the punishment the jury assessed.

For instance, the sentence does not reflect that the jury was trying to make Bell eligible for parole as early as possible. If it had wanted to do that, it would have assessed the minimum punishment of twenty-five years under the habitual offender statute. *See* TEX. PEN.CODE ANN. § 12.42(d). Following the erroneous instruction, the jury would have concluded that Bell would be eligible for parole in twelve and one-half years. Yet, the jury actually assessed Bell's punishment at thirty-two and one-half years, which under the erroneous instruction would have made Bell eligible for parole in sixteen years, three months. Thus, under the erroneous instruction, the jury made Bell eligible for parole three years, nine months later than he would have been had it assessed the minimum punishment.

The sentence also does not reflect that the jury sought to make Bell eligible for parole as late as possible. If it wanted to do that, it would have assessed his punishment at sixty years or more. Under the erroneous instruction, the jury would have concluded that Bell would be eligible for parole in thirty years. *See* TEX.CODE CRIM. PROC. ANN. art. 37.07, § 4(a). Instead, the jury assessed Bell's punishment at thirty-two and one-half years, far less than the level necessary to make Bell eligible for parole on the latest possible date. Thus, under the erroneous instruction, the jury made Bell eligible for parole thirteen years, nine months earlier than it could have. We cannot conclude, therefore, that the jury's verdict was materially affected by the erroneous instruction.

Further, had the jury sought to make Bell eligible for parole as late as possible, then Bell arguably benefitted from the erroneous instruction. Under the law applicable to his case, Bell will actually be eligible for parole in just over eight years, rather than sixteen years, three months as the jury would have concluded based on the erroneous instruction. *See* TEX.CODE CRIM. PROC. ANN. art. 37.07, § 4(b). Thus, Bell will be eligible for parole in almost half the time the jury thought he would be

under the erroneous instruction. Bell's first issue on appeal is overruled.

In his second issue on appeal, Bell contends the evidence is factually insufficient. Officer Scott Lisenby testified as follows. He was on patrol in Beaumont around 2:00 a.m. on March 11, 1999. He observed a beige Cadillac being driven north and swerving from lane to lane. The vehicle "abruptly changed lanes into the center lane and then turned into" a motel parking lot. Lisenby followed, activated his warning lights, and shined his spotlight on the vehicle.

He saw the driver lean over and throw something out of the passenger's side window. The object landed in the driveway of the motel, and Lisenby mentally noted where it landed. The driver swerved the vehicle to the left, went around a circular driveway, and traveled about 200 feet in the opposite direction before stopping.

The driver immediately exited the vehicle "as if he was going to run on foot." Lisenby pulled his patrol car toward the driver's side of the car to block the driver's retreat. The driver then stopped by the door of his car.

Lisenby exited his patrol car and approached the driver, who appeared nervous and was sweating noticeably. The driver asked Lisenby what the problem was, but before Lisenby could answer, the driver "quickly turned as if he was going to dart away." Lisenby stepped in front of him, so the driver "immediately turned and tried to get back in his car." Lisenby grabbed the driver's arm and told him to stay where he was. Bell spun around and hit Lisenby in the neck. The two men struggled, and the driver eventually broke free and fled.

Lisenby gave chase on foot. The driver ran to the back of the motel and climbed over a six-foot fence. Lisenby also climbed the fence, but some of the equipment he was wearing became stuck at the top. As he freed himself, the driver jumped over a second fence and made his escape. At trial, Lisenby identified Bell as the driver.

Lisenby immediately returned to the place where he saw the driver throw an object from his vehicle. The object was a small package containing cocaine. Lisenby also conducted an inventory search of the vehicle and found a bag containing "a bunch of cash" and a larger quantity of cocaine. The bag also contained Bell's driver's license, a payroll check made out to Bell, and a payroll stub with Bell's name on it. Police later issued a warrant for Bell's arrest.

Bell offered the testimony of Glen Segura, who testified that in early March, 1999, he did some mechanical work on a Cadillac that Bell owned. He testified that Bell told him to drive the car to Bell's mother's house when he had finished the work and leave the keys under the seat if nobody was home. He testified that Bell called him and asked if he was still working on the car, but he told Bell he had finished and had left the car at Bell's mother's house, as Bell had instructed. Segura testified that Bell told him the car was not there, and the two men drove around in Segura's car looking for the Cadillac.

Bell's mother testified that around March 10, 1999, someone left her son's Cadillac parked at her residence. When she awoke the next day, the car was gone. Bell's wife testified that the car was parked at Bell's mother's house on March 10. Early in the morning of March 11, Bell woke her to tell her the car had been stolen. She testified that she thought it was around 4:00 a.m. when Bell woke her, but believed it could have been earlier. She also testified that she reported the theft to police.

Bell testified that he left the car at Segura's house on March 5, 1999, to be worked on. He testified he told Segura to leave the car at Bell's mother's house when he was finished with the work. He called his mother on March 9 and was told the car was there. Around 1:00 a.m. on March 11, Bell's mother called him to say that the car was missing. He testified that he kept his driver's license in the glove compartment of his car, but he denied having drugs in the car.

Under a factual sufficiency analysis, we examine whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. *Johnson v. State*, 23 S.W.3d 1, 9 (Tex.Crim.App.2000); *see also Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim. App.1996). Accordingly, we reverse the fact finder's determination only to "arrest the occurrence of a manifest injustice." *Johnson*, 23 S.W.3d at 12. Otherwise, we must give due deference to the fact finder's determinations concerning the weight and credibility of the evidence. *Id.* at 9.

To support a conviction for possession of a controlled substance, the State must show (1) that the accused exercised actual care, control, or custody of the substance, (2) that he was conscious of his connection with it, and (3) that he possessed the substance knowingly or intentionally. *Brown v. State*, 911 S.W.2d 744, 747 (Tex.Crim.App.1995); *Jones v. State*, 963 S.W.2d 826, 830 (Tex.App.—Texarkana 1998, pet. ref'd). The evidence used to satisfy these elements can be direct or circumstantial. *Brown v. State*, 911 S.W.2d at 747; *Jones v. State*, 963 S.W.2d at 830. Whether direct or circumstantial evidence is used, the State must establish that the accused's connection with the substance was more than just fortuitous. *Brown v. State*, 911 S.W.2d at 747; *Jones v. State*, 963 S.W.2d at 830. However, when the contraband is not found on the accused's person or it is not in the accused's exclusive possession, additional facts must affirmatively link the accused to the contraband. *Jones v. State*, 963 S.W.2d at 830. The affirmative link ordinarily emerges from an orchestration of several factors and the logical force they have in combination. *Id.*

Factors to be considered when evaluating affirmative links include: (1) whether the defendant was present when the search was executed; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the contraband; (4) whether the defendant was under the influence of a controlled substance when arrested; (5) whether the defendant possessed other contraband when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of the contraband; (10) whether other contraband or drug paraphernalia was present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; and (12) whether the place the drugs were found was enclosed. *Id.*

Reviewing the evidence in a neutral light, we conclude that the proof of Bell's guilt is not so obviously weak as to undermine confidence in the jury's verdict. The State's case depends on Lisenby's identification of Bell as the driver of the Cadillac. It was the driver who threw the object containing cocaine out the passenger's side window. It was the driver who appeared nervous and was sweating noticeably. It was the driver who struggled

with Lisenby and eventually escaped. Lisenby found cocaine and cash in a bag in the trunk of the car the driver was driving.

As judge of the credibility and demeanor of the witnesses, the jury was free to believe Lisenby when he testified that Bell was driving the car. The jury's verdict is supported by the fact that Lisenby was close to the driver as they struggled. Further, Lisenby testified that he identified Bell from the driver's license found in the trunk of Bell's car immediately after the incident.

Bell contends the jury ignored the uncontroverted testimony of Bell's witnesses, who testified that the car was stolen from Bell's mother's house in the evening of March 10, 1999. However, the jury could have simply disbelieved these witnesses. There are also minor inconsistencies in their testimonies. Bell's mother never testified that she called Bell early on March 11 to tell him the car was missing. Rather, she testified that when she awoke, the car was gone. Bell's wife never testified that she heard Bell's mother call; rather, she testified that Bell woke her to tell her the car was missing.

Even if the jury believed Bell's witnesses, it could have rationally concluded that Bell retrieved the car from his mother's house after his wife and mother were in bed. Bell testified that he knew the car was at his mother's house on March 9. His wife testified that she went to bed around 10:00 p.m. and that Bell woke her around 4:00 a.m. Lisenby testified he encountered the Cadillac around 2:00 a.m. The timing is consistent with Bell retrieving the car after 10:00 p.m., being stopped by Lisenby around 2:00 a.m., and waking his wife around 4:00 a.m.

The judgment is affirmed.